IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BETTY WASHINGTON KING | ) | CASE NO. 1:08 cv 709 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM OPINION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Betty Washington King's application for Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court REVERSES and REMANDS the decision of the Commissioner for further proceedings not inconsistent with this decision.

## I. **PROCEDURAL HISTORY**

On July 7, 2004, Plaintiff filed an application for Social Security Disability Insurance benefits and Supplemental Security Income benefits, alleging a disability onset date of June 29, 2004 due to limitations related to cardiac disease and asthma. On July 23, 2007, Administrative

1

Law Judge Jeffery A. Hatfield (the "ALJ") determined Plaintiff had the residual functional capacity ("RFC") to perform a range of light work and, therefore, was not disabled (Tr. 9-9M). On appeal, Plaintiff claims that the ALJ erred in: (1) determining that Plaintiff has the RFC for light work; (2) failing to give the proper weight to the opinions of Plaintiff's treating physicians in formulating her RFC; and (3) failing to afford Plaintiff's testimony the proper weight in formulating her RFC.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born on December 4, 1954 (age 52 at the time of the ALJ's determination), Plaintiff is an "individual closely approaching advanced age."  *See* 20 C.F.R. §§404.1563, 416. 963.  Plaintiff graduated from high school, completed some vocational training and has past relevant work as a nurse's assistant (Tr. 63, 362).

### B.  Medical Evidence

On April 4, 2002, a CT angiogram of Plaintiff's chest was normal (Tr. 127).  During a heart catheterization performed on Plaintiff in April 2002, Dr. Chetan Patel found a "proximal LAD lesion of 50%" and that Plaintiff's Left circumflex artery "has mild diffuse disease" (Tr. 117).  On March 20, 2003, an echocardiogram report indicated that Plaintiff had an ejection fraction of 50 to 60% and normal left ventricular wall motion (Tr. 75).

On January 17, 2004, an electrocardiogram indicated sinus bradycardia with sinus arrhythmia but was otherwise normal (Tr. 190).

On February 28, 2004 Plaintiff presented to the hospital with uncontrolled nose bleeding, requiring an adjustment in therapy for her hypertension (Tr. 142).

The results of Plaintiff's echocardiogram dated February 29, 2004 showed normal left ventricular contractility with slight hypertrophy, suggestive of hypertensive cardiovascular disease and mild tricuspid regurgitation (Tr. 153).

On March 25, 2004, Plaintiff's cardiologist, Ahmad Banna, M.D. reported that Plaintiff achieved 9 METS during the course of a stress nuclear test (Tr. 95).  Dr. Banna concluded that Plaintiff was negative for angina, positive for ischemia in the inferolateral lead, negative for arrhythmia, and had good exercise tolerance (Id.).  The test was discontinued "due to fatigue and shortness of breath and achieving target heart rate" (Id.).  Myoview nuclear imaging results showed a small anterior ischemia and normal ejection fraction (Tr. 96, 240).

On April 2, 2004, another cardiac catheterization indicated an ostial diagonal about 50% lesion and an ejection fraction of about 50 to 60% (Tr. 97).

On August 25, 2004, Plaintiff's family practitioner Lynn Smith, M.D. completed a form in which he stated that Plaintiff had no sensory deficit, muscle weakness, reflex abnormalities, muscle spasms, muscle atrophy, or symptoms of radiculopathy (Tr. 74).  He stated that Plaintiff's range of motion in the joints and spine was not limited, and Plaintiff's gait was normal (Id.).

Alok Bhaiji, M.D. evaluated Plaintiff on October 22, 2004 (Tr. 87).  According to Dr. Bhaiji's notes, Plaintiff complained of chest pain, had a history of uncontrolled hypertension and chronic bronchitis, and experienced shortness of breath after walking 10 to 15 feet (Id.).  Plaintiff's blood pressure was 181/90 (Tr. 87).  Dr. Bhaiji opined that Plaintiff would not have difficulty with "work-related physical activities such as sitting," but might "have difficulty standing, walking, lifting, and carrying objects" (Tr. 89).

On November 14, 2004, Plaintiff presented to the emergency room complaining that she had been assaulted (Tr. 193). She was treated and advised to follow up for evaluation of possible nasal fracture with Dr. Smith, her primary care physician (Tr. 193-95). Scott Nelson, M.D., an otolaryngologist, reported that Plaintiff had sustained a nasal fracture, and on November 22, 2003, Plaintiff underwent closed reduction surgery (Tr. 201, 204, 261-62, 297). Dr. Nelson noted no functional limitations based on her nasal fracture (Tr. 202, 297).

On December 15, 2004, Thomas Vogel, M.D., a state agency physician, reviewed the record and opined that Plaintiff can perform the exertional requirements of light work with the following nonexertional limitations: occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, and avoid concentrated exposure to extreme cold or heat and poor ventilation of fumes, odor, and gasis (Tr. 224-31). He opined that Plaintiff can stand and/or walk for about 6 hours in an 8 hour day (Tr. 225). In making his determination, Dr. Vogel considered Plaintiff's possible congestive heart failure found on a consultative exam and cardiac catheterization which showed an ejection fraction of 50 to 60% (Id.). He noted Plaintiff's history of chronic bronchitis and scattered rhonchi, but he observed that there were no signs of wheezing or rails (Id.). In addition, he considered Plaintiff's complaints of chest pain, for which Plaintiff takes nitro, and pointed out that the pain goes away with rest (Id.). On January 7, 2005, Robert Weisenburger, M.D., another state agency physician, reviewed the evidence and affirmed Dr. Vogel's assessment (Tr. 231).

On April 28, 2005, Dr. Banna completed a form in which he described Plaintiff's medical conditions as chest pain, moderate coronary artery disease, hypertension, and asthma (Tr. 243). He opined that Plaintiff's abilities to stand, walk and sit were not affected and that Plaintiff could

occasionally lift 21 to 25 pounds and frequently lift up to 10 pounds (Tr. 245).  He also opined that Plaintiff was moderately limited in her ability to push and pull (Id.).

On May 4, 2005, Plaintiff went to the emergency room for back pain (Tr. 253).  X-rays of Plaintiff's cervical and lumbar spine were normal (Tr. 248-49).

On May 16, 2005, Plaintiff presented to D.K. Lee, M.D., complaining of intermittent achy pain, stiffness, occasional sharp pain in her neck, mid-back pain, and lower lumbar pain (Tr. 290).  She said that it had been going on since 1983 when she was in a motor vehicle accident, but that her condition had worsened in the past two to three years (Id.).  She stated that her pain was aggravated by turning her head, sitting or standing for long periods, walking, and bending (Id.).  Plaintiff's neurological examination was normal (Id.).  She had tenderness to palpation in her neck, thoracic spine, and lumbar spine and some reduced motion in her cervical spine (Id.).  Dr. Lee diagnosed Plaintiff with cervicalgia, cervical strain/sprain, thoracalgia, thoracic strain/sprain, lumbalgia, lumbar strain/sprain, myalgia, myositis, myofascial pain syndrome (Tr. 291).  He recommended intermittent traction, ultrasound therapy, electrical stimulation, and myofascial release (Id.).

On May 20, 2005, Dr. Smith completed a form which identified Plaintiff's conditions as hypertension, elevated cholesterol, and moderate blockage in the coronary arteries (Tr. 294).  Dr. Smith opined that Plaintiff was limited to standing/walking for 3 to 4 hours in an 8-hour work-day and for 1 hour without interruption and lifting up to 25 pounds frequently (Tr. 295).  He further opined that Plaintiff had moderate limitations on bending (Id.).

On September 27, 2005, Thomas Reader, M.D., with Disability Reinsurance Management Services, Inc. wrote a letter to Dr. Smith expressing his opinions regarding the

extent of Plaintiff's functional limitations based on the medical evidence (Tr. 325-26).  He noted

that Plaintiff had been treated for chest pain but that there was no evidence of myocardial

infarction or wall motion abnormality on multiple cardiac studies (Tr. 325).  He further noted

Plaintiff achieved 10.1 METS during exercise treadmill testing conducted in December 1997

(Id.).  There was no evidence of ischemia and Plaintiff's stress echocardiogram was normal (Id.).

Plaintiff's resting echocardiogram on March 20, 2003 was normal with an ejection fraction of 50

to 60% and normal left ventricular wall motion (Id.).  During another nuclear stress test using a

Bruce Protocol on March 25, 2004, Plaintiff achieved 9 METS without symptoms, evidence of

wall motion abnormality, or reduced ejection fraction (Id.).  There were some suggestions of a

small area of anterior ischemia; however, a cardiac catheterization on April 2, 2004 revealed no

obstruction lesions and no diseased arteries in the area perfusing the anterior cardiac wall (Id.).

At the end of his letter, Dr. Reader wrote:

> The information I have reviewed is not consistent with physical functional
> impairment from any condition given her objective performance on exercise tests
> and her documented physical activity.
>
> If you agree with this assessment, I request that you acknowledge the same by
> signing in the space provided at the bottom of this letter and returning it to me via
> fax (207) 591-3776.  If you wish to make changes, additions, or deletions, please
> do so in the margins or attach an addendum and return the entire document to me
> at the above fax number.  If you disagree, I request your response with specific
> physical exam and objective diagnostic testing abnormalities to support any
> claimed restrictions (things she should not do) and limitations (things she cannot
> do)

(Id.).  Dr. Smith signed the letter on September 28, 2005 (Id.).

On July 23, 2006, an ultrasound of Plaintiff's carotid arteries showed no

hemodynamically significant stenosis or significant plaques on either side (Tr. 310).

6

On June 29, 2006, Plaintiff underwent a resting electrocardiogram (Tr. 317). While walking the treadmilll using a Bruce Protocol, Plaintiff acheived 7 METS (Id.). Plaintiff complained of shortness of breath, dizziness, fatigue and chest pain, and the test was discontinued (Id.). Dr. Hanna concluded: "71% of maximum stress test, positive for chest pain with shortness of breath. Undetermined for ischemia, negative for arrhythmia with poor exercise tolerance and hypertensive response" (Id.). A nuclear mycardial perfusion scan and nuclear gated spect wall motion study indicated normal exam with suboptimal stress (Tr. 316).

On June 7, 2007, a stress nuclear test was positive for chest heaviness with some shortness of breath, undetermined for ischemia due to an abnormal electrocardiogram, and negative for malignant arrhythmia (Tr. 328).

On June 8, 2007, Dr. Smith wrote that he was treating Plaintiff for chronic bronchitis and asthma, and that it would be in Plaintiff's best interest to have an air conditioner in her home for the hot, summer months (Tr. 331).

On June 9, 2007, Plaintiff underwent an esophagogastroduodenoscopy with biopsy (Tr. 332). Her preoperative diagnosis was chest pain and dysphagia (Id.). There was mild irregularity of the GE junction, but no overt inflammation (Id.). Her postoperative diagnosis was mildlly irregular gastroesphageal junction (Id.). She was started on Prilosec (Id.)

### C. Additional Evidence

In a report completed on September 10, 2004, Plaintiff described the types of activities she does on a regular basis. She indicated that she helps her disabled son get ready for the day (Tr. 53). She prepares meals for herself and her disabled son (Id.). She feeds her two dogs, with help from her sons (Id.). She performs household chores, including light dusting and folding

laundry (Tr. 55).  She picks up small twigs and puts them in the garbage (Id.).  She goes outside every day and is able to walk and drive (Id.).  She goes grocery shopping twice a month, with someone else carrying the heavy items (Id.).  She goes to her parents' house once or twice a week, attends church three times per month, and goes to the drugstore twice a month (Tr. 56).

### D. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified that she experiences pain in her chest, back and arms (Tr. 366).  She stated that she takes Nitro spray and Albuterol for her conditions (Tr. 366-67).  She experiences shortness of breath every time she has chest pain (Tr. 367).  She has pain starting in her neck and going into the lower part of her back (Id.).  The pain is constant and worsens if Plaintiff sits or stands too long or walks (Id.).  She is most comfortable when stretched out on the couch or bed, and she does this 2 to 3 times per day for a total of 2 to 3 hours (Id.).  Plaintiff estimates that she can walk about 20 feet before having to stop due to pain in her chest and her lower back, and before her left knee gives out (Tr. 368).  She can stand for 30 minutes, but after 30 minutes she experiences low back and chest pain (Id.).  She can sit for about 30 minutes before having to stand for another 30 minutes, at which point which she can sit again (Id.).  She has difficulty going up and down stairs due to low back and chest pain and shortness of breath (Tr. 369).  She experiences pain on bending (Id.).  She can lift 10 pounds (Id.).  When she reaches, she has pain in her neck which radiates down to her lower back (Id.).  She has three to four headaches each day, for which she takes aspirin or Tylenol (Tr. 369-70). She experiences dizziness and lightheadedness (Tr. 370).  Plaintiff has problems sleeping due to pain, swelling in her hands,

and numbness in her fingertips and toes (Id.).  She also stated that she has anxiety and depression (Id.).

Plaintiff further testified that her medications give her headaches, stiffness of the body, blurred vision, and chest pain (Tr. 373).  She does not take anything for her alleged anxiety or depression, and stated that her primary care physician, Dr. Smith, "laughed when [she] told him what [she] was experiencing" (Tr. 380).  Plaintiff stated that she has to go to the ER twice a year during allergy season due to chronic bronchitis and asthma (Tr. 380).  However, there are no records of Plaintiff's claimed seasonal visits to the ER (Tr. 381).

Plaintiff testified that she lives with her husband and 32-year-old son who has cerebral palsy (Tr. 361).  Plaintiff stated that she drives occasionally (Tr. 363).  She also stated that she can feed, bathe and dress herself, but that "it takes a lot longer" ( Tr. 370).  She can wash dishes, but has to alternate between sitting and standing in order to do so (Tr. 371).  She can make the bed at a slow pace, dust in intervals, wash clothes if her husband takes them in and out of the machines, shop for groceries if her husband does the lifting for her, and cook if she sits while doing so (Id.).  She stated that she prepares meals "very seldom" and mostly uses the microwave" (Id.).  She does not go to movies or church (Tr. 372).  She visits with her family once or twice a week, but they come to her house for their visits (Id.).  She watches television (Id.). Plaintiff further testified that she does a lot of knee-bending at home and that she also walks and exercises her arms a lot (Tr. 379).

## 2.  Medical Expert Testimony

Franklin Plotkin, M.D., an internist with a secondary specialty in cardiology, testified as a medical expert at the hearing (Tr. 15, 374).  He reviewed the medical evidence of record (Tr.

375).  He testified that Plaintiff has complained of chest pain throughout the record, and that Plaintiff's chest pain had been addressed by catheterization, CAT scan of the chest, and stress nuclear tests (Id.).  Dr. Plotkin indicated that "by [and] large, these [tests] have been normal" (Id.).  He noted that even though tests indicated that Plaintiff's left anterior descending artery had narrowed 50% at the osteo of a large branch, 50% is not a significant amount of narrowing (Tr. 376).  He also noted that Plaintiff has been able to achieve 9 METS and 7 METS during stress nuclear tests, and that these levels correspond with a moderate degree of exercise (Id.). Dr. Plotkin acknowledged that Plaintiff showed a small anterior area of ischemia on one test, but explained that it is difficult to tell whether Plaintiff's apparent ischemia is real "because of the smallness of it" (Id.).  The test conducted at 7 METS was normal (Id.).  He noted that Plaintiff does not have a diagnosis of obstructive coronary artery disease, but that she does have hypertension, which was not controlled satisfactorily (Id.).  Additionally, in her most recent stress nuclear test, she had a hypertensive response to the exercise - specifically, her systolic pressure went up excessively (Tr. 37).  X-rays of Plaintiff's back from May 2005 were negative, despite complaints of back pain (Tr. 376-77).  Dr. Plotkin considered the state agency physician opinion indicating that Plaintiff retained the RFC for light work in May 2005 (Tr. 377).  He noted that Plaintiff claimed at that time that she could stand or walk only for three to four hours during an eight-hour day (Id.).  Dr. Plotkin noted that Plaintiff uses inhalers for asthma, nitroglycerine spray and Veraimil for blood pressure, and aspirin (Tr. 378).

Dr. Plotkin opined that Plaintiff does not meet or equal a listed impairment (Tr. 383).  He further opined that Plaintiff could stand and/or walk for a total of 6 hours in an 8-hour day if she

were given breaks or a sit/stand option (Tr. 384).  As far as lifting, he opined that Plaintiff had

the RFC for light work (Id.).  He also adopted the restrictions of the state agency physician (Id.).

### 3.  Vocational Expert Testimony

Nancy Borgeson, the vocational expert (the "VE"), testified at the hearing (Tr. 386).  The

ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education and past work

experience who can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and

walk for 6 hours in an 8-hour period, but only one hour at a time, at which point she has to take a

short break; sit for 6 hours in an 8-hour day, with the ability to adjust herself every 30 minutes to

relieve discomfort; can occasionally use stairs, stoop, kneel and crouch, but could never climb

ladders, ropes or scaffolds or crawl; and should avoid concentrated exposure to extreme cold and

heat, fumes, odors, dust, and gases and concentrated exposure to poor ventilation (Tr. 387-88).

The VE testified that such a person could not perform Plaintiff's past relevant work as a nurse's

assistant (Tr. 388).  However, when asked whether such a person could perform any other work

existing in significant numbers in the national economy, the VE testified that such a person

could work (Id.)  Specifically the VE testified that at the light level, such an individual could

perform work as a cashier II (14,000 jobs in northeast Ohio and over 1,600,000 jobs nationally),

a mail clerk (1,450 jobs in northeast Ohio and over 167,000 nationally), and a bench assembler

of small parts (10,000 jobs in northeast Ohio and over 752,000 jobs nationally) (Tr. 388-89).

Those figures would all be reduced by 25% to allow for short breaks (Tr. 389).

### III.  DISABILITY STANDARD

A claimant is entitled to receive Supplemental Security Income benefits only when she

establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.

A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. §§ 404.1505, 416.905.

## IV. <u>STANDARD OF REVIEW</u>

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the

Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  ANALYSIS

### A.  Whether the ALJ Erred in Failing to Give Proper Weight to the Opinion of Plaintiff's Treating Physician

Plaintiff argues that the ALJ in this case erred by failing to give controlling weight to the opinion of her treating physician, Dr. Smith, that Plaintiff can stand and/or walk only for 3-4 hours in an 8-hour day.  Although the Court believes that the record may contain substantial evidence to support discounting Dr. Smith's opinion, the Court finds that remand is required because the ALJ failed to provide any reasons for his decision to reject Dr. Smith's opinion.

If a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," it should receive controlling weight.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001). This is known as the "treating physician doctrine."  However, the weighing of medical evidence is the province of the Commissioner.  Where there are conflicting medical opinions resulting from essentially the same objective medical data, it is the responsibility of the ALJ to resolve those conflicts - *See Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990); *see also Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 803 (6th Cir. 2008) - and the ALJ may rely on the opinion of a medical expert in doing so.  *See Hale v. Secretary of Health & Human Servs.*, 816 F.2d 1078, 1083 (6th Cir. 1987); *Schumer v. Comm'r of Soc. Sec.*, 109 Fed. Appx. 97, 101 (6th Cir. 2004).

Plaintiff's primary care physician, Dr. Smith, opined in a form completed in May 2005 that Plaintiff can stand and/or walk only 3 to 4 hours out of an 8-hour day (Tr. 295).  Later,

however, Dr. Smith appeared to have changed his mind.  In September 2005, state agency physician Dr. Reader wrote Dr. Smith a letter containing the following language:

> You claimed in a 5/10/05 Medical Assistance Form that Ms. Washington could stand and walk for 3-4 hours a day, sitting was unaffected, and she could lift up to 25 lb.  However, I could not find any evidence in your records or those of Orthopedists Meyers and Nahra, Cardiologists Banna and Espinoza, and Otolaryngologist Nelson to support any work restrictions

(Tr. 325).  Dr. Reader's letter goes on to describe much of the medical evidence in the record, including the normal results of Plaintiff's stress and resting echocardiograms, the cardiac catheterization which revealed no obstructive lesions or diseased arteries, and the results of Plaintiff's Bruce Protocol treadmill tests during which Plaintiff achieved 10.1 and 9 METS (Id.). Toward the end of his letter, Dr. Reader writes:

> The information I have reviewed is not consistent with physical functional impairment from any condition given her objective performance on exercise tests and her documented physical activity.
>
> *If you agree with this assessment, I request that you acknowledge the same by signing in the space provided at the bottom of this letter* and returning it to me via fax (207) 591-3776.  If you wish to make changes, additions, or deletions, please do so in the margins or attach an addendum and return the entire document to me at the above fax number.  If you disagree, I request your response with specific physical exam and objective diagnostic testing abnormalities to support any claimed restrictions (things she should not do) and limitations (things she cannot do)

(Tr. 326) (Emphasis added).  Dr. Smith signed and dated the bottom of the letter and apparently did not make any changes or additions to it in the margins or on a separate page (*See* id.). Accordingly, it appears that as of September 2005 Dr. Smith had changed his mind regarding the extent of Plaintiff's limitations and largely agreed with Dr. Reader's assessment that Plaintiff has no functional impairments precluding all work activity.

14

In *Stanley v. Sec. of Health and Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994), the Court held that an ALJ apparently need not credit the opinion of a treating physician who changes his mind regarding a claimant's functional limitations but does not provide any objective medical evidence to support his shift in opinion.  Specifically, the *Stanley* Court stated:

> Stanley relies heavily on the opinion of his treating physician Dr. Goswami who reported that claimant was disabled.  We conclude, however, that the ALJ did not err in declining to refer to this opinion because Dr. Goswami originally opined that claimant could perform sedentary work and did not provide any objective medical evidence to support his change of heart.

*Id. See also Boucher v. Apfel*, 2000 WL 1769520 at *9 (6th Cir. 2000) ("The regulations permit the Commissioner to reject a changed medical opinion when the underlying medical results do not substantiate that change in opinion.").  In this case, Dr. Smith apparently had a "change of heart" regarding the extent of Plaintiff's functional limitations but did not provide any medical evidence to support his shift in opinion.  He merely signed and returned Dr. Reader's letter.  Under *Stanley*, therefore, the ALJ need not have credited Dr. Smith's May 2005 opinion regarding Plaintiff's standing and walking limitations.

However, if the ALJ rejects of discounts the opinion of a treating physician, the ALJ must articulate clearly "good reasons" for doing so.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  Specifically, if a treating source is not accorded controlling weight, the ALJ must apply the following factors in determining what weight to assign the opinion - the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a

whole, and the specialization of the source.  20 C.F.R. § 404.1527(d).  An ALJ's failure to give "good reasons" is grounds for reversal, even where there is substantial evidence in the record supporting the ALJ's decision to discredit the treating source's opinion.  *See Wilson*, 378 F.3d at 544.  The procedural requirement of giving "good reasons" applies even if the treating source's opinion concerns an issue reserved to the Commissioner, such as the claimant's RFC.  *See* SSR 96-5p, 1996 WL 374183 at *6 ("Treating source opinions on issues reserved to the Commissioner will never be given controlling weight.  *However, the notice of the determination or decision must explain the consideration given to the treating source's opinion*.") (Emphasis added); SSR 96-8p, 1996 WL 374184 at *7 ("The RFC assessment must always consider and address medical source opinions.  *If the RFC assessment conflicts with the opinion from a medical source, the adjudicator must explain why the opinion was not adopted*.") (Emphasis added).

Although it is implicit in his written decision that the ALJ rejected Dr. Smith's May 2005 opinion that Plaintiff can stand and/or walk only for 3-4 hours a day, the ALJ did not even state that he was rejecting Dr. Smith's May 2005 opinion, let alone articulate *any* reasons, good or bad, for his decision to reject it.  The ALJ's decision merely recounts some of the doctors' opinions; it does not indicate explicitly what weight the ALJ gave to each opinion or explain why some of the medical opinions deserved less weight than others.  In his decision, the ALJ mentions Dr. Smith's May 2005 opinion and alludes to Dr. Reader's letter, but he does not mention the fact that Dr. Smith signed the letter or discuss Dr. Smith's "change of heart."  Under *Wilson*, such failure to give "good reasons" for discounting the opinion of a treating physician is

grounds for reversal, even where - as in this case - there is substantial evidence in the record for discounting the treating physician's opinion.

The Court also finds that the ALJ's failure to give "good reasons" for discounting Dr. Smith's May 2005 opinion was not harmless error. The *Wilson* Court stated that a violation of the procedural rule of giving "good reasons" might constitute harmless error in three situations: (1) "if the treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion" making it "irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight [] correspondingly irrelevant;" or (3) "where the Commissioner has met the goal of . . . the procedural safeguard of reasons[] even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.

Situation (1) does not apply in this case. Although Dr. Smith apparently had a "change of heart" regarding his May 2005 opinion, the Court cannot say that Dr. Smith's May 2005 opinion was "so patently deficient that the Commissioner could not possibly credit it." The medical evidence in this case reflects that Plaintiff suffers from a number of documented medical problems, including chest pain, hypertension and asthma. The degree of functional limitations Plaintiff has as a result of these medical conditions is to some extent a subjective matter, and the Court does not find that Dr. Smith's opinion that Plaintiff is limited to standing and walking 3-4 hours a day was so wildly off the mark that the Commissioner was free to ignore it entirely. Situation (2) clearly does not apply because the ALJ did not adopt or make findings consistent with Dr. Smith's assessment of Plaintiff's standing and walking limitations;

17

rather, he implicitly rejected Dr. Smith's opinion.  Situation (3) also does not apply.  Some of the goals underlying the procedural rule of giving "good reasons" are to "make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," to "ensure[] that the ALJ applies the treating physician rule and [to] permit[] meaningful review of the ALJ's application of the rule."  *Id.* at 544-45.  The ALJ's decision in this case consists of little more than a laundry list of Social Security Regulations and scattered pieces of evidence.  It contains little, if any, application of law to the facts.  Given the paucity of reasoning in the ALJ's decision, the Court cannot say that the ALJ in this case served the goals of the procedural rule, let alone complied with its letter.  Therefore, the Court finds that the ALJ's failure to give "good reasons" for discounting Dr. Smith's May 2005 opinion was not harmless error and that remand is required based on this issue.

**B.  Whether the ALJ Erred in Failing to Give Proper Weight to Plaintiff's Testimony**

Plaintiff argues that the ALJ erred by failing to give proper weight to her hearing testimony.  Specifically, Plaintiff argues that the ALJ improperly weighed a form she filled out in 2004 much more heavily than her 2007 hearing testimony in making his credibility determination.  The Court finds that remand is required based on this issue as well because the ALJ's perfunctory analysis reflects that he did not give any weight to Plaintiff's 2007 hearing testimony and the ALJ failed to state with specificity the reasons for discrediting Plaintiff's hearing testimony.

Although an ALJ's credibility determinations "deserve great respect," an ALJ's decision "must articulate with specificity reasons for the findings and conclusions that he or she makes." *Bailey v. Commissioner of Social Security*, 173 F.3d 428, 1999 WL 96920, *4 (6th Cir. 1999)

18

(Table); *see also Hurst v. Secretary of Health and Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985).  Among the factors the ALJ must consider in making his credibility determination are the claimant's daily activities; the location, duration, frequency and intensity of the symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication taken to alleviate symptoms; treatment, other than medication, the claimant receives to relieve pain; measures used by the claimant to relieve symptoms; and any other factors concerning functional limitations due to symptoms.  *See Felisky*, 35 F.3d at 1039-40; 20 C.F.R. § 416.929(a), (c)(3). "It is more than merely 'helpful' for the ALJ to articulate reasons . . . for crediting or rejecting particular sources of evidence.  It is absolutely essential for meaningful appellate review."  *Hurst*, 753 F.2d at 519, *quoting Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984). SSR 96-7p, 1996 WL 374186 at *4 provides:

> It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'  *It also is not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms*.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

(Emphasis added).  As *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) explains, "In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence."

Here too, the ALJ's written decision falls short of the mark.  Although the ALJ lists - not once, but twice - in his decision the factors he was required to consider in making his credibility

determination as set forth in SSR 96-7p, the ALJ's analysis of these factors never materializes. The extent of the ALJ's consideration of the credibility issue is as follows:

> In September 2004 the claimant stated that she assisted her son in getting her disabled son [sic] ready in the morning.  She fixes his breakfast and lunch, takes walks, prepares meals, feeds two dogs, folds laundry, dusts, picks up twigs, goes shopping, visits her parents, and goes to church (Exhibit 1E).  Thus, despite her numerous complaints, the claimant remains fairly active performing household chores, caring for her children, shopping, and taking care of two dogs . . . . In view of the claimant's testimony, the clinical findings, and taking into consideration Social Security Ruling 96-7p, the preponderance of the evidence shows that allegations of pain and limitations which preclude the performance of substantial gainful work activity are not fully credible.

(Tr. 9K).

It is clear from this portion of the ALJ's written decision that the ALJ based his credibility determination overwhelmingly on Plaintiff's activities as she described them in 2004. However, Plaintiff testified at the 2007 hearing that she no longer is able to perform some of these activities and that she able to do others only with qualifications.  For instance, Plaintiff testified in 2007 that she no longer is able to go to church or to visit her family - rather they now must come to her house for their visits (Tr. 372).  She is able to shop for groceries only if someone else does the lifting for her, and she can dust only in intervals (Tr. 371).  Although in 2004 Plaintiff stated that she was able to prepare "stews [and] beans" and "bake cornbreads, bake meats in [the] oven" (tr. 54), she now prepares meals "very seldom" and mostly uses the microwave (Id.).  Yet the ALJ fails to mention any of this testimony.  Although it is clear from this perfunctory analysis that the ALJ chose to discredit Plaintiff's 2007 hearing testimony, it is not clear *why* he chose to do so.  Rather, it appears that the ALJ chose to discredit Plaintiff's allegations regarding the severity of her symptoms based on a form she filled out in 2004, despite the fact that some of Plaintiff's abilities, at least according to her 2007 testimony, have

deteriorated since then. Accordingly, the ALJ's use of the present tense here - i.e., that "the claimant *remains* fairly active" based on her 2004 activities - is to some extent a mis-characterization of the facts and does not provide a sound basis for discounting Plaintiff's credibility. Based on the fact that the ALJ's credibility determination appears to ignore completely Plaintiff's 2007 testimony and the ALJ's failure to state with specificity the reasons for discrediting that testimony, the Court finds that the ALJ's credibility determination is not supported by substantial evidence. In so finding, the Court does not presume to say that there may not be reasons for discounting Plaintiff's credibility, only that the ALJ's analysis with regard to this issue does not pass muster. Therefore, remand based on this issue is required.

### C.  Whether the ALJ Erred in Determining that Plaintiff has the RFC for Light Work

Plaintiff initially presents this as a separate issue her brief but does not develop any separate arguments in support of it. It is well settled that:

> issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm.*, 59 F.3d 284, 293-94 (1st Cir. 1995)). Moreover, the issue essentially is subsumed by Plaintiff's other arguments - i.e., that the ALJ erred by improperly rejecting the opinions of her treating physicians in making the RFC determination; and that the ALJ improperly rejected Plaintiff's own testimony in making the RFC determination. Therefore, the Court does not address this argument separately.

21

## VI.  **DECISION**

For the foregoing reasons, the Court REVERSES and REMANDS the decision of the Commissioner for further proceedings not inconsistent with this Memorandum Opinion.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: November 19, 2008

22